**BARRIER INDUSTRIES, INC.,**
**Appellants,**

v.

**Jack M. ECKARD et al., Appellees.**

**No. 77–1530.**

United States Court of Appeals,
District of Columbia Circuit.

Argued June 13, 1978.

Decided Aug. 15, 1978.

---

Allen M. Hutter, Washington, D. C., with whom Hugh H. Lewis, Washington, D. C., were on the brief for Barrier Industries, Inc.

Earl J. Silbert, U. S. Atty., Washington, D. C., with whom John A. Terry, David R. Schlee, Kenneth M. Raisler, Asst. U. S. Attys., Washington, D. C., were on the brief for Jack M. Eckard, et al.

Before TAMM and MacKINNON, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the court filed by MARKEY, Chief Judge.

MARKEY, Chief Judge:

Appeal from an order of the district court granting appellees' (Eckard's) ** motion for summary judgment in an action involving General Services Administration contracts to purchase liquid floor wax. We affirm.

### FACTS

We adopt the pertinent portions of Judge Howard F. Corcoran's excellent presentation of the facts: [1]

This action * * * challenges a determination by the Committee for Purchase from the Blind and other Severely Handicapped [the Committee] to add certain water emulsion floor wax [1] [floor wax] to

[1] This commodity is identified by * * * GSA National Stock Numbers: NSN 7930–00–205–2870 (gallon), NSN 7930–00–141–5888 (5-gallon container), and NSN 739–00–205–2871 (55-gallon drum).

the Procurement List 1976 for mandatory Government purchase in five General Serv-

---

* Sitting by designation pursuant to Title 28, U.S.C. § 293(a).

** Jack M. Eckard has been replaced as Administrator of the General Services Administration by Jay Solomon. To avoid confusion, the case retains the caption as filed.

1. As set forth in the district court's Memorandum and Order of February 28, 1977, in which it denied Barrier's motion for a preliminary injunction.

ices Administration [GSA] Regions[2] from

[2] GSA Regions 1, 2, 3, 5, and 10 (which include northeastern, central, and northwestern United States).

qualified blind workshops, pursuant to the Javits-Wagner-O'Day Act. 41 U.S.C. §§ 46–48 [the Act].

The plaintiff, Barrier Industries, Inc. [Barrier], is a New Jersey corporation with principal manufacturing facilities located in Port Jervis, New York. From December 2, 1974 until October 31, 1976, Barrier had been a successful competitive bidder for and supplier of floor wax on the GSA Qualified Products List [QPL] for Regions 1 through 8, inclusive.

Jack M. Eckard, Administrator of GSA, is named as a defendant. * * *

Defendant Charles W. Fletcher is the Executive Director of the Committee. The Committee was created pursuant to the Act for the purpose of increasing employment opportunities for the blind and other severely handicapped individuals and, wherever possible, preparing such persons to engage in normal competitive employment. 41 U.S.C. § 47(e). The Committee's functions under the Act include responsibility for determining what products are suitable for procurement by the Government from qualified workshops for the blind and other severely handicapped, 41 U.S.C. § 47(a), and for establishing the fair market prices which the Government should pay for those products. 41 U.S.C. § 47(b). When a determination has been made by the Committee that a commodity is suitable for Government procurement, it is then added to the current procurement list and * * * entities of the Federal Government in all or certain specified GSA Regions are then required to purchase that item through GSA from the designated source. 41 U.S.C. §§ 47–48.

Defendant W. Harold Bleakley is President of the Center for the Blind [the Center] a private nonprofit corporation established under the laws of Pennsylvania in 1874 and located in Philadelphia where it operates a sheltered workshop for the employment and rehabilitation of sightless and multihandicapped persons. The Center has been engaged in the manufacture of various products for the past 102 years.

On November 9, 1976, the National Industries for the Blind[4] [N.I.B.] requested

[4] N.I.B. is a non-profit agency incorporated under the laws of the State of New York and is separate and distinct from the Center for the Blind. It has been designated by the Committee as the central non-profit agency to facilitate distribution of Government orders for Procurement List commodities and services among qualified non-profit agencies for the blind and other severely handicapped. See 41 U.S.C. § 47(a); 41 C.F.R. § 51–3.2. Additionally, since 1938, N.I.B. has assisted the Committee in evaluating workshop capability and has provided technical and engineering assistance to workshops to develop their capabilities. See 41 C.F.R. § 51–3.2. In the instant case, the Engineering Staff of N.I.B. made an independent evaluation and analysis of the Center's ability to manufacture floor wax to GSA specifications prior to submitting its November 9th recommendation to the Committee. The N.I.B. study concluded that the Center was fully capable of manufacturing the floor wax.

that the Committee assign three items of floor wax[5] for development by one of its

[5] See n. 1, supra. The original recommendations by N.I.B. proposed the inclusion of floor wax for virtually all GSA regions, as well as a separate item known as floor finish.

workshops for possible addition to the Committee's Procurement List 1976. * * *. [T]he Committee on March 17, 1976 assigned the floor wax to N.I.B. for development by the Center's blind workshop.

On April 23, 1976, pursuant to Section 2(a)(2) of the Act, 41 U.S.C. § 47(a)(2), the Committee published in the Federal Register a notice of the proposed addition to the Procurement List of floor wax and five other groups of chemical compounds and cleaners which the Center was interested in producing. * * *.[8]

[8] * * *. In the present case, no comments were received in response to the April, 1976 notice.

The Committee staff, on April 30, 1976, requested GSA to inspect the Center to determine its technical capability to produce the floor wax. On May 10, the Federal Supply Service, GSA, informed the Committee staff that the type of floor wax

under consideration was a QPL item and that the Center's product would be subject to GSA approval (as meeting all applicable QPL requirements) before GSA could procure the product from the Center.

On May 11, 1976, N.I.B. requested Committee approval of proposed prices for the floor wax, see 41 U.S.C. § 47(b), and, on the following day, it submitted a completed initial justification recommending that the floor wax and five other types of chemical compounds and cleaners be added to the Procurement List. The Committee staff completed its analysis of the proposed prices for the floor wax on May 13, 1976, and determined that the prices were fair market prices, except for the 5-gallon container price which was thereafter reduced. However, the staff determined that N.I.B.'s initial justification was unacceptable because it appeared that the potential economic impact on Barrier and another firm could be severe and that the proposed coverage of GSA Regions was inconsistent with GSA's method of procurement. Defendant Fletcher informed N.I.B. of the Committee staff's objections and recommended that the proposal be limited to approximately one third of the Government requirement for the floor wax and be otherwise consistent with GSA's method of procurement.

On May 21, 1976, N.I.B. responded to Fletcher's suggestions by submitting a revised page 2 to its initial justification proposing that the addition of the floor wax be limited to GSA regions 1, 2, 3, 5 and 10. The revision left nearly 64 percent of the Government's requirements for the floor wax available for competitive procurement. At the same time, N.I.B. withdrew its proposal for the addition of three NSN's of non-buffing floor finish, one of the groups of commodities included in the April 23 notice of the Federal Register.[9]

[9] Barrier was also a current GSA contractor for these items.

* * *

**2.** Barrier contends that "the record is devoid of any such staff analysis," but fails to explain

N.I.B.'s revised justification was reviewed by the Committee staff, critical information contained therein was verified, and a staff analysis of industry impact was prepared. On May 28, 1976, the staff sent a so-called vote letter to each Committee member requesting consideration of the proposed addition of the floor wax to the Procurement List. Copies of the N.I.B. justification with two addenda and the staff analysis of industry impact were enclosed with the vote letters.[2]

By June 23, 1976, the Committee members had unanimously approved the addition of floor wax to the Procurement List for production by the Center, contingent only upon the approval of the Center's product by GSA as meeting all QPL requirements. On August 2, 1976, GSA informed the Committee that the Center's floor wax satisfied all QPL requirements and that the Center was considered an authorized QPL supplier.[11]

[11] GSA performed its tests upon a sample taken from a 300-gallon batch of floor wax produced by the Center in June 1976. Due to the intense time pressure to supply a test sample to GSA under a deadline, one ingredient of the test batch, viz., wax emulsion, was produced by a private supplier and included by the Center in its manufacturing process. The emulsion was produced however, in strict accordance with the chemical formula and manufacturing procedures which will be employed in the Center's own manufacturing process, using raw materials supplied by the Center. Mr. Bleakley testified that the wax emulsion is a basically fungible chemical compound which can be produced by any chemical manufacturing concern with sufficient equipment and know-how. Moreover, on January 28, 1977, GSA certified the results of its inspection and analysis of 31 55-gallon drums of floor wax manufactured by the Center for shipment to GSA warehouses in Illinois and the State of Washington. This quantity of floor wax, totalling in excess of 1,700 gallons, was found to meet all QPL requirements, and was in fact manufactured from ingredients, including wax emulsion, produced by the Center.

Accordingly, on August 6, 1976, the Committee published in the Federal Register a notice of the addition of floor wax to the

what bearing that might have on resolution of the issue before us.

Procurement List for GSA Regions 1, 2, 3, 5, and 10. 41 Fed.Reg. 32943.[12] On the

[12] Plaintiff claims to have received actual notice of the Committee's action by way of an amended GSA solicitation dated August 25, 1976, deleting regions 1, 2, 3, 5, and 10 from the commodity solicitation for floor wax.

same date, the Committee sent notice to GSA and N.I.B. officially informing them that the floor wax had been added to the Procurement List and specifing [sic] the prices at which the commodity would be available for government purchase.

On September 20, 1976, attorneys representing Barrier contacted the Committee staff by telephone, alleging that the Center was engaged in a violation of the zoning regulations of the City of Philadelphia, Pennsylvania. It was further asserted that a Barrier investigator had visited the Center's plant facilities and reported that the Center was not capable of manufacturing the floor wax.[13]

[13] This was the first the Committee and its staff learned of Barrier's opposition to the addition of floor wax to the Procurement List.

This telephone call was followed by a series of letters from attorneys for the plaintiff [Barrier] requesting reconsideration of the Committee's determination to add floor wax to the Procurement List on the grounds, inter alia, that the Center could not qualify as a non-profit agency capable of producing the floor wax; that the Center's blind workers would be subjected to hazardous operations in the manufacturing process; that the Center's manufacturing facilities were operating for violation of city zoning ordinances; that the Center would purchase the basic wax emulsion from another manufacturer and, therefore, would not be making an appreciable contribution to manufacture of the floor wax; and that severe economic impact

would result to Barrier if the commodity remained on the Procurement List.

The Committee thereupon requested verification or denial of the Barrier charges from N.I.B. and the Center, and directed its staff industrial engineer to visit the Center (1) to verify the manufacturing process contemplated by the Center, (2) to insure that it had the equipment necessary to perform the contemplated manufacturing, and (3) to gather data which would resolve any disparities between the Center's representations and Barrier's allegations.

Defendant Bleakley, in response to the Committee's inquiries, issued a detailed, categorical denial of the allegations. On October 19, 1976, the Committee's staff industrial engineer inspected the Center's manufacturing facilities and, thereafter, reported to the Committee, on the basis of his on-site inspection, that in his professional opinion, "the Center for the Blind has the capability to produce the floor wax and, in the manufacture of the floor wax, fully meets the definition of production in the Committee's Regulations."

In early October, 1976, Barrier lodged with the General Accounting Office [GAO] a protest (Bid Protest No. B–187554) of the GSA award and the Committee's decision to add floor wax to the Procurement List. That protest remains pending at the present time.[3]

Barrier instituted the present action [motion for preliminary injunction] on October 26, 1976. Simultaneously it moved for an order temporarily restraining the defendants from implementing any GSA contract for the purchase of floor wax. That motion was denied on October 27, 1976. [Various footnotes omitted.]

**3.** That protest was decided on March 2, 1977, by the Acting Comptroller General. Barrier protested GSA's deletion of Regions 1, 2, 3, 5, and 10 from its solicitation for floor wax and the Center's receipt of a set-aside for those regions.

On GSA's deletion of the listed regions from its solicitation, the Comptroller General held that once the Committee had determined that the floor wax should be placed on its procurement list, GSA was without discretion in the matter. Under the Act, GSA was required to

remove the floor wax from competitive procurement which it did by deleting the appropriate regions from its solicitation. The Comptroller General found no error in GSA's decision to leave the remainder of its solicitation open to competitive bidding.

On the propriety of the Committee's determination to place the floor wax on its procurement list, the Comptroller General held that GAO had no authority over Commission determinations.

Accordingly, Barrier's protest was dismissed.

The district court denied Barrier's motion for preliminary injunction, and cross-motions for summary judgment were filed by Eckard and Barrier. In an order dated April 29, 1977, the court granted Eckard's motion and denied Barrier's "for reasons stated in our Memorandum and Order of February 28, 1977." Barrier appeals from the court's order of April 29, 1977.

## OPINION

### SCOPE OF REVIEW

■ The Javits-Wagner-O'Day Act, 41 U.S.C. §§ 46–48, provides that additions of commodities to the procurement list must follow the rulemaking procedure of § 4 of the Administrative Procedure Act, 5 U.S.C. § 553(b)–(e). That procedure was followed here. Accordingly, review is governed by 5 U.S.C. § 706(2)(A), requiring that agency action be set aside only if it be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The limitations upon that review have been described by the Supreme Court:

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment * * *. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." The agency must articulate a "rational connection between the facts found and the choice made." While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. [Citations omitted.]

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *accord, Ethyl Corp. v. Environmental Protection Agency,* 176 U.S.App.D.C. 373, 406, 541 F.2d 1, 34 (1976) (en banc),

*cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Thus, if a rational basis exists for the agency action, the agency's decision must be affirmed. *Ethyl Corp., supra.*

### "SUITABLE" FOR PROCUREMENT

Under the Act, 41 U.S.C. § 47(a)(1), the Committee may include on the procurement list only those commodities which it determines "suitable" for procurement. Neither the Act nor regulations promulgated thereunder define "suitable." The Committee has, however, interpreted "suitable" to mean: (1) that a qualified workshop must be capable of producing the commodity at a fair market price, and (2) that the addition of the commodity to the procurement list will not have a serious adverse impact on the current or most recent contractors for the commodity. Barrier contends that the Committee had no rational basis for determining suitability under either (1) or (2). We disagree.

### (1) Capable of Producing

Regarding the Committee's conclusion that a reasonable basis existed for its determination that the Center was capable of producing the floor wax, we agree with the district court:

> [T]he Committee's conclusion that the Center is capable of producing the floor wax to GSA specification was based upon: (1) the fact that GSA tested the floor wax produced by the Center and thereafter included it on the GSA Qualified Products List; (2) interviews of defendant Bleakley by the Committee staff in which manufacturing procedures and process for the wax were discussed in detail; (3) the judgment of the Committee staff that the Center is capable of producing the commodity to GSA specifications;[15] and (4) the independent judg-

[15] This judgment is reflected in the fact that the vote letter sent to Committee members contained no adverse statement regarding the Center's capability. Defendant Fletcher testified that the Committee relies upon its staff to call to its attention any problem regarding, *inter alia*, a workshop's capability to manufacture an item. If the staff sees no such problem, the vote letter contains no such references.

ment of N.I.B. that the Center is capable of producing the floor wax to GSA specifications. On the record presently before the Court it is evident that Barrier has not established that the Committee's determination of the Center's manufacturing capacity was other than rational and, in fact, the evidence adduced to this point in the case is uncontroverted that the Center does in fact have the capacity to manufacture the floor wax to GSA specifications.

Barrier's main contention is that prior to the Committee's approval the Center had produced only a test sample, using sighted labor and a primary ingredient (wax emulsion) produced by a private supplier. Barrier contends that "[t]his test batch could not and did not constitute a commodity 'produced by' a qualified blind workshop under the Act, 41 U.S.C. § 47(a)(1) * * * [because] the law requires that in the production of a commodity, *blind individuals* must apply 'not less than 75% of the man-hours of direct labor, required for the production * * * of the commodity.' "[4] Production of the wax emulsion accounted for approximately 88% of the total manufacturing process.

Neither the Act nor the regulations require that a workshop for the blind actually produce a commodity prior to its inclusion on the procurement list. Indeed, as held by the district court "all that is required is that a workshop demonstrate a potential to produce the particular commodity."[5] The record is devoid of evidence indicating an absence of rational basis for the Committee's conclusion that the Center demonstrated a potential to produce the wax.

Barrier asserts that "[n]ot only would federal procurement policies be subverted, but the Act would be made a mockery if the Court's decision were left to stand." The heart and soul of the Act, however, is to assist workshops for the blind and other severely handicapped individuals through government procurement. To that end, such workshops are intended to receive "preferential treatment." H.R.Rep.No. 1315, 93d Cong., 2d Sess. 3 (1974). *See also* H.R.Rep.No.228, 92d Cong., 1st Sess. 6–7 (1971); U.S.Code Cong. & Admin.News 1971, p. 1079. That is not to say that government procurement policy may be subverted or that the Committee has been invested with a *carte blanche* authority. On the contrary, as with every government agency, the Committee must act at all times forthrightly, in good conscience, and in accord with the statute and applicable regulations. Nothing in the Act or in its legislative history, or in any regulation, limits set-asides to workshops already manufacturing the commodity involved. Such limitation would, moreover, conflict with the legislative history indication that Congress intended to give the Committee broad discretion "to be an active force within the Government in attempting to aid the sale of products and services by blind and other severely handicapped persons to the Federal Government." H.R.Rep.No.228, 92d Cong., 1st Sess. 7–8 (1971); U.S.Code Cong. & Admin.News 1971, p. 1084.

Regarding the Act's requirement that 75% of direct labor man-hours be performed by blind individuals, the district court found

4. Barrier also complains that "[t]he record in these proceedings is totally devoid of any evidence of O.S.H.A. certification of the Center for its floor wax production facility." It is not clear that Barrier has standing as a third-party to contest an alleged lack of O.S.H.A. compliance. In all events, the record is equally devoid of evidence that the Center did not meet O.S.H.A. requirements. The Committee received no adverse O.S.H.A. reports concerning the Center from the Department of Labor, the agency charged with enforcing the Act.

The record contains nothing to indicate that, at the time of the Committee's determination it

was unreasonable to conclude that the Center met the statutory definition for "qualified nonprofit agency for the blind." 41 U.S.C. § 48b(3).

5. As noted by the district court, the House Committee on Government Operations stated: "Whenever a blind workshop demonstrate[s] a potential to produce an item to Government standards, at an agreed upon fair price, the Government contract[s] for all or part of its needs with that workshop so long as the item was required." H.R.Rep.1315, 93d Cong., 2d Sess. 3 (1974).

that "during the fiscal year 1975, 85.5 percent of the total man-hours of direct labor performed at the Center were performed by blind individuals. As of August 6, 1976, 93.9 percent of the total direct labor hours performed at the Center were performed by the blind." The district court also found that the "record reflects that blind persons will perform over 80 percent of the total direct labor hours required in the manufacture of floor wax for GSA at the Center," and concluded that the Center fulfilled the 75 percentum requirement. Barrier points to no evidence requiring a contrary conclusion.

Committee regulations require: "In the production of commodities under the Act, a workshop shall make an appreciable contribution to the reforming of raw materials or the assembly of components or a combination thereof." 41 C.F.R. § 51–4.5. Because the wax emulsion in the sample was produced by a private supplier, Barrier says the Center did not make an "appreciable contribution."

The district court, however, found that:

The record herein demonstrates not only that the Center will make an "appreciable contribution" to the reforming of raw materials in the production of floor wax, but that it will in fact perform an entire process of reforming raw materials through a series of complex manufacturing steps.

The affidavit of defendant Bleakley states that "the Center for the Blind will perform all operations normally carried out by a manufacturer in the business of producing [the floor wax]." The manufacturing process to be performed by the Center includes ten manufacturing steps which will reform 17 chemical raw materials into floor wax meeting GSA specifications. The Center's operation accordingly can hardly be termed, as Barrier suggests, a mere "packaging" or "filling" process. Their [sic] production requirements of the Act have clearly been met.

Thus Barrier's concentration on the sample is insufficient to establish the Center's incapability. As also found by the district court, the Center demonstrated its capability by manufacturing more than 1700 gallons of floor wax meeting all QPL requirements from ingredients, including emulsion, produced by the Center. Barrier asserts an absence of evidence that those 1700 gallons were produced by blind individuals or that other requirements of the Act were satisfied. That contention again misconceives the burden of proof. In challenging the Committee's action, Barrier must prove that the Committee had not properly determined that the Center was capable of producing the floor wax in question. It has not done so on this record.

Barrier argues that the Center never intended to produce the wax emulsion and did so only after Barrier's challenge. As "evidence" Barrier points out that the only equipment in operating condition on-site at the Center, as late as August 18, 1976, was that needed to mix the ingredients in an agitator, and cites expert testimony that more elaborate equipment, e. g., steam-jacketed kettles, was needed to prepare the emulsion. As the district court made clear, however, the Act and its legislative history establish the requirement that a *potential* for producing the commodity be demonstrated, not that a workshop be *able* to produce the commodity *before* that commodity is placed on the restricted procurement list. The Committee's investigators reported that the Center had the required potential, and the Committee's industrial engineer confirmed that judgment in his October, 1976 report. Thus, the Center's lack of equipment needed to produce floor wax emulsion on the date floor wax was placed on the list is not dispositive; nor does the absence of steam kettles when the procurement became official establish absence of intent to install them, particularly in the light of their having been installed shortly thereafter.

In sum, Barrier simply failed to establish on this record that the Committee's determination, that the Center had the potential to produce the commodity involved, was in any way unreasonable or arbitrary.

## (2) Adverse Impact

Regarding the Committee's conclusion that the set-aside would not have a serious adverse impact on Barrier, we again agree with the view stated by the district court:

Obviously any action which reduces the number and quantity of items available for competitive bidding will necessarily have some direct or indirect impact on firms previously competing for such business. In enacting the Javits-Wagner-O'Day Act, Congress acknowledged and accepted the fact that every Procurement List set aside will deprive private industry of a substantial amount of potential business,[16] and the present case is certain-

[16] See H.R.Rep.No.93–1315, at 15; Hearings, H.R. Comm. on Govt. Operations. November 1973, at 15–16.

ly no exception. However a comparison between the initial N.I.B. proposal and the final Committee action clearly demonstrates that the Committee took reasonable affirmative action to limit the impact of its action upon Barrier.

As of May, 1976, plaintiff's floor wax contracts for the GSA regions affected by the Committee's action had an annual value of $539,350.00 in contrast to Barrier's total annual sales of $3,323,169.00. The contracts affected by the set aside, accordingly, represented a maximum of 16.2 percent of Barrier's annual sales. During the same period, Barrier's floor wax contracts for all GSA regions totaled $1,453,627.00. The estimated annual value of contracts in the five regions unaffected by the set aside, and still available for competitive procurement is $1,441,-449.00. Consequently, the total GSA

floor wax business remaining after the Committee set aside was substantially equivalent to the amount of such business which Barrier had in the previous contract year. If plaintiff had successfully bid on the remaining GSA floor wax business, its net loss of business would have been minimal. And further it is important to keep in mind that there was and is no guarantee that Barrier would have retained its floor wax contracts for GSA Regions 1, 2, 3, 5, and 10, during the present contract year had the Committee taken no action.

In light of these circumstances, plaintiff has not carried its burden of demonstrating that the Committee's determination as to economic impact was arbitrary, capricious or unreasonable.

■ Barrier complains that it did not receive direct notice of the proposed addition of floor wax to the procurement list, and cites a report by the General Accounting Office (GAO) critical of failures to directly notify current or recent government suppliers of a proposed set-aside. The notice required by the Act, however, is publication in the Federal Register, 41 U.S.C. § 47(a)(2) and that notice was entered here. That the proliferation of notices in the Federal Register may render reliance thereon illusory would not warrant the imposition by this court of a notice requirement more direct than that established by the Congress.

In reaching its conclusion that no serious adverse impact would ensue, the Committee reviewed GSA contracts, bid sheets, and Dun and Bradstreet reports concerning Barrier.[6] Barrier does not contest the accu-

**6.** Barrier argues that the Committee made only a cursory investigation of the impact on Barrier, and that, contrary to *Ballerina Pen Co. v. Kunzig*, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), *cert. dismissed*, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971), it delegated to NIB the entire test for determining impact.

In *Ballerina Pen*, this court did not reach the merits. It held that companies such as Barrier had standing to challenge allegedly illegal actions taken by the Committee in adding commodities to the procurement list. One of the illegal actions allegedly there taken by the Committee was use of NIB feasibility, engineer-

ing, economic, or other studies in determining whether certain commodities should be added to the procurement list. This court said:

Whether this delegation of authority exceeds the statutory powers of the Committee must await determination in the district court on remand. This allegation, however, along with others advanced by the appellants, clearly constitutes the kind of prima facie showing called for by the criteria established by this court in *Scanwell Laboratories*, [137 U.S.App.D.C. 371,] 424 F.2d 859 (1970).

Unlike *Ballerina Pen*, the Committee staff did not here place absolute reliance on NIB's rec-

racy of the material reviewed by the Committee, but complains that its marketing strategy was not considered. Because of that strategy, Barrier contends that "the Committee's decision to apply the Act and set-aside floor wax procurements in GSA Regions 1, 2, 3, 5, and 10, had the same effect on Barrier as if the set-aside had been approved for all GSA Regions, since it was only these predominately East Coast markets which permitted Barrier to compete nationwide."

Barrier's failure to note the publication of the proposed set-aside in the Federal Register meant that it missed its opportunity to submit comments, including an explanation of its marketing strategy. Barrier's arguments to the contrary notwithstanding, the Committee was not under any obligation to solicit information directly from Barrier. Therefore, the sole question is whether, given the information the Committee had before it, the Committee arrived at a reasonable conclusion. As indicated above, we agree with the district court that the Committee's conclusion was reasonable.[7]

## QPL REQUIREMENTS

Barrier contends that GSA improperly certified the Center's floor wax as meeting QPL requirements. The Federal Specification reads:

The samples offered for qualification by the manufacturer shall be from production batches of the same size used in producing floor finish in commercial quantities. Small pilot plants and experimental formulations will not be considered as complying.

Barrier argues that the 300-gallon batch prepared by the Center for QPL testing was not a "production batch," because it was not produced by blind workers and included privately supplied emulsion. Because the Center's primary production line was incomplete and non-functional, Barrier says the test sample was taken from a "small pilot plant," contrary to the specification. Because of spartan conditions at the Center, Barrier says the GSA inspector could not have performed all inspections required by GSA's Quality Control Manual.

GSA conducted its QPL test by drawing five one-gallon samples from what it viewed as a production run 300-gallon batch of wax. The Chief of the Chemical Branch of GSA, the Chief of GSA's Technical Operations Branch, Quality Control Division, and a GSA Quality Specialist all testified that a 50–300 gallon batch of wax qualified as a "production batch." There was no prohibition against using privately supplied emulsion or equipment different from that to be used in subsequent manufacturing operations. The emulsion was made in compliance with the chemical formula and manufacturing procedures to be used by the Center, and was prepared from raw materials furnished by the Center.

Though there is some merit in Barrier's contention that GSA's QPL inspection was not as thorough and probing as may be desired, we cannot, viewing the record as a whole, conclude that GSA's QPL certification was in this case so unwarranted or unreasonable as to render arbitrary or capricious the Committee's determination to add the floor wax to the Procurement List.

## CONCLUSION

█ Nothing in the record requires us to conclude that the Committee acted arbitrarily or capriciously in determining that the

---

ommendation and, in fact, caused the recommendation to be revised. So far as the record indicates, the ultimate determination of whether to add floor wax to the procurement list resided at all times with the Committee and there was no improper delegation of Committee responsibilities to NIB.

7. In support of reasonableness Eckard says the Committee did not include East Coast Region 4 (a region with 1976 floor wax contracts greater than Regions 1, 2, and 3 combined), leaving more than 50% of East Coast contracts available to Barrier through public bidding. Eckard also says Barrier's average bid for Regions 4, 6, 7, 8, and 9 for the contract year beginning November 1, 1976, was less than its corresponding bid one year earlier, i. e., before the set-aside. Subsequent occurrences, however, cannot form justifications for Committee action.

involved floor wax product was "suitable," that the Center was capable of producing acceptable floor wax, and that the adverse impact on Barrier was not so serious as to preclude the Committee's challenged action. Nor does anything of record reflect the presence of reversible error below. Accordingly, the judgment of the district court is affirmed.