## McGREGOR PRINTING CORPORATION,
### Appellant,

v.

**Ira KEMP; Committee for Purchase from the Blind and Other Severely Handicapped; National Industries for the Blind; the United States of America, Appellees.**

No. 92–5375.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 3, 1994.

Decided April 19, 1994.

John P. Meade, argued the cause and filed the briefs for appellant.

Mark W. Pennak, Atty., U.S. Dept. of Justice, argued the cause for appellees. With him on the brief for federal appellees were Eric H. Holder, Jr., U.S. Atty., and Barbara C. Biddle, Atty., U.S. Dept. of Justice. Theodore C. Hirt and John C. Hoyle, Attys., U.S. Dept. of Justice, entered appearances. On the brief for appellee, Nat. Industries for the Blind, were Paul M. Frank, Daniel J. O'Neil and Jonathan Russin.

Before: WALD, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

In September 1991, the Committee for Purchase from the Blind and Other Severely Handicapped included tabulating machine paper, known by the last four digits of its National Stock Number as "0996," in the list of commodities all federal government entities must purchase from nonprofit agencies employing blind or other severely disabled persons. At the time of the Committee's decision, McGregor Printing Corporation was one of two suppliers of 0996 to the federal government. McGregor sued to set aside the Committee's decision. In a memorandum opinion and order the district court ruled in favor of the Committee. Because we find the Committee's decision to add 0996 to the list arbitrary and capricious, we reverse.

I

In 1938, Congress established the Committee on Purchases of Blind-made Products, composed of "a private citizen conversant with the problems incident to the employment of the blind" and representatives of the Departments of the Navy, War, Treasury, Agriculture, Commerce, and Interior. Act of June 25, 1938, ch. 697, 52 Stat. 1196 ("the Wagner–O'Day Act"). The Wagner–O'Day Act assigned the Committee the duty of determining the fair market price "of all brooms and mops and other suitable commodities manufactured by the blind and offered for sale to the Federal Government by any non-profit-making agency for the blind," *id.*, and required that in procuring such products, the government should purchase them from the blind so long as the products were manufactured according to federal specifications. *See id.*

Now known as the Javits–Wagner–O'Day Act ("the Act"), the current Act establishes the Committee for Purchase From People Who Are Blind and Severely Disabled,[1] 41 U.S.C. § 46, composed of fifteen members. Eleven represent the Departments of Agriculture, Defense, Army, Navy, Air Force,

---

**1.** At the time of the decision under review, the Committee was called the Committee for the Purchase from the Blind and Other Severely Handicapped. The name was changed to its current form in 1992. Act of Oct. 29, 1992,

Health and Human Services,[2] Commerce, Veterans Affairs, Justice, Labor, and the General Services Administration; of the others, one must be conversant with the problems incident to employment of the blind, one must be conversant with the same problems of other severely handicapped individuals, one must represent individuals employed in qualified nonprofit agencies for the blind, and one must represent other severely handicapped individuals so employed. *See id.* The Committee is responsible for establishing and publishing in the Federal Register a list of commodities and services provided by "qualified nonprofit agencies" for the blind and other severely handicapped individuals which the Committee determines, through informal rulemaking in accordance with 5 U.S.C. § 553(b), (c), (d), & (e), are suitable for procurement by the government, 41 U.S.C. § 47(a). The Committee also must determine, and revise periodically, the fair market value of those commodities and services. *See* 41 U.S.C. § 47(b). The Act requires that:

> If any entity of the Government intends to procure any commodity or service on the procurement list, that entity shall, in accordance with rules and regulations of the Committee, procure such commodity or service, at the price established by the Committee, from a qualified nonprofit agency for the blind or such an agency for other severely handicapped....

41 U.S.C. § 48. "[Q]ualified nonprofit agency for the blind" is defined, in part, as a nonprofit organization operated in the interest of blind individuals that,

> in the production of commodities and in the provision of services (whether or not the commodities or services are procured under this Act) during the fiscal year employs blind individuals for not less than 75 per centum of the man-hours of direct labor required for the production or provision of the commodities or services.

Pub.L. No. 102–569, tit. IX, subtit. B, § 911(a), 106 Stat. 4344, 4486.

**2.** The Act lists the Department of Health, Education, and Welfare. Under 20 U.S.C. § 3508, all references to HEW in the United States Code are to be considered references to HHS.

41 U.S.C. § 48b(3). "[D]irect labor" is defined as "all work required for preparation, processing, and packing of a commodity, or work directly relating to the performance of a service, but not supervision, administration, inspection, or shipping." 41 U.S.C. § 48b(5). The Act directs the Committee to "designate a central nonprofit agency or agencies to facilitate the distribution ... of orders of the Government for commodities and services on the procurement list among qualified nonprofit agencies for the blind or such agencies for other severely handicapped." 41 U.S.C. § 47(c).

The Committee revised its regulations after it had added 0996 to the procurement list but before the Committee rejected McGregor's petition for reconsideration. *See* 56 Fed.Reg. 48,974 (Sept. 26, 1991) (effective date Oct. 28, 1991).[3] Both sets of regulations closely track the Act's language. In order for the Committee to conclude that a commodity is suitable for addition to the procurement list, the Committee is required to determine a fair market price for the commodity and to determine that a qualified workshop is capable of producing the commodity at that price and in accordance with government quality standards and delivery schedules. *See* 41 C.F.R. §§ 51–2.5, 51–2.6(a)(1) & (b) (1990); 41 C.F.R. §§ 51–2.2(c), 51–2.4(c) & (d) (1993). The Committee must determine that "[t]he addition of the commodity ... to the Procurement List would not have a serious adverse impact on the current or most recent contractor for the commodity." 41 C.F.R. § 51–2.6 (1990); *see* 41 C.F.R. § 51–2.4(e) (1993). To these conditions, the new regulations add an explicit requirement that "the proposed addition must demonstrate a potential to generate employment for persons who are blind or have other severe disabilities." 41 C.F.R. § 51–2.4(a) (1993).

In making the first determination, the fair market price for the commodity, the Committee shall:

**3.** Neither the parties nor the intervenor saw fit even to mention the changes. For the most part, the revisions merely altered terminology. 56 Fed.Reg. 48,974 (Sept. 26, 1991).

consider recommendations from the procuring agencies and the central nonprofit agency concerned. Recommendations for fair market prices ... shall be submitted by the workshops to the central nonprofit agency representing the workshop. The central non-profit agency shall analyze the data and submit a recommended fair market price to the Committee along with the detailed justification necessary to support the recommended price.

41 C.F.R. § 51–2.5 (1990); *see* 41 C.F.R. § 51–2.7 (1993) (substantially similar). This is explained in more detail in an extensive series of Pricing Memoranda and in instructions accompanying the forms on which the central nonprofit agency's submissions are required to be made. Simply put, "[t]he initial price for a commodity which has been recently procured by the Government shall be the median of those bids for that commodity which are not more than 35% above the award price, or the award price increased by 5%, whichever is greater." Committee for Purchase From the Blind and Other Severely Handicapped, Pricing Memorandum No. 1— Oct. 16, 1989.

The factors relevant to the Committee's determination that a nonprofit agency for the blind or other severely handicapped is "qualified" are found in three places in the regulations. The first, the definition of "[q]ualified nonprofit agency for the blind," *see* 41 C.F.R. § 51–1.2(h) (1990); 41 C.F.R. § 51–1.3 (1993), is nearly identical to that in the Act, requiring that the agency be operated in the interest of the blind, and not for profit, and that 75 percent of the man-hours of direct labor required for production be performed by the blind. The second is in the discussion of suitability. The 1990 regulations required that a specific workshop must:

satisfy the Committee that it will have the capability to meet the Government's quality standards and delivery schedules by the time it assumes responsibility for supplying the Government under the Act and that it can supply he [sic] commodity or service at a fair market price.

41 C.F.R. § 51–2.6(b) (1990). The revised regulations are substantially similar, *see* 41 C.F.R. § 51–2.4(c) & (d) (1993), but require

in addition that the workshops "satisfy the Committee as to the extent of the labor operations to be performed." *Id.* § 51–2.4(c). This addition, like the added suitability requirement noted above, derives from the Committee's determination, discussed in the preamble of the final rule, that "it is the policy of the Government to increase employment and training opportunities for persons who are blind or have other severe disabilities through ... the [Javits–Wagner–O'Day program]." (56 Fed.Reg. at 48,974). Third, the workshop must meet detailed application, recordkeeping, and financial requirements specified at 41 C.F.R. pt. 51–4 (1990 & 1993).

The portion of the regulations concerning "serious adverse impact" provides:

(d) In deciding whether or not a proposed addition to the Procurement List would have a serious adverse impact on the current or most recent contractor for the particular commodity or service, the Committee gives particular attention to:

(1) The possible impact on that contractor's sales, including any cumulative impact as the result of other recent Committee actions.

(2) Whether or not that contractor has been a continuous supplier to the Government of the specific commodity or service proposed for addition· and is, therefore, more dependent on the income from such sales to the Government, and

(3) Any substantive comments received as the result of the notice in the FEDERAL REGISTER.

41 C.F.R. § 51–2.6(d) (1990); *see* 41 C.F.R. § 51–2.4(e) (1993) (no substantive changes). The Committee has made this determination, almost exclusively, by reviewing GSA contracts, bid sheets and the current suppliers' Dun & Bradstreet Reports to learn what percentage of the suppliers' total sales stemmed from providing the commodity to the government. *See, e.g., Barrier Indus., Inc. v. Eckard,* 584 F.2d 1074, 1082–83 (D.C.Cir.1978). The Committee has not stated what proportion of the suppliers' sales would have to be lost to constitute a "serious adverse impact."

With approximately 100 new commodities and services added to the procurement list each year, the list now contains approximately 4,500 entries. In 1993, procurement under the Act brought more than 500 nonprofit agencies for the blind and severely handicapped persons approximately $75.6 million in government contracts, and resulted in the employment or training of more than 23,000 Americans with disabilities. Beverly L. Milkman, et al., *Who are they? some answers from a survey of Javits–Wagner–O'Day employees,* AMERICAN REHABILITATION, Spring 1993, at 7, 8, 10. Due to the large scope of the program and the small size of the Committee's resources—Congress appropriated only $1.6 million for the Committee's fiscal year 1991, *see* Kenneth R. Laureys, *The JWOD Program and NISH: making America strong by employing people with severe disabilities,* AMERICAN REHABILITATION, Spring 1991, at 14—the Committee relies heavily on the two central nonprofit agencies it has designated under the Act, 41 U.S.C. § 47(c), to represent the workshops for the blind and other severely handicapped: the National Industries for the Blind ("NIB") and the National Industries for the Severely Handicapped. In return for their assistance, the central agencies receive a four percent commission of the contracts received by the workshops.

## II

On May 21, 1991, NIB submitted to the Committee a request for the addition of 0996 to the procurement list. In its request and the accompanying documentation, NIB certified that an NIB engineer had visited six workshops for the blind and found them able to produce the government's total annual requirement for 0996 (1,053,981 boxes). NIB calculated the fair market price for 0996 to be $13.02 per box, or a total of $13,722,-832.07. It certified that the workshops would be able to produce 0996 for that price, and that doing so would create 78 new jobs for blind workers. With the application, NIB also submitted a form listing two cur-

rent and three prior contractors for 0996, and information regarding how adding 0996 to the procurement list would affect the sales of the two current contractors.[4] NIB also submitted forms on which the participating workshops certified, with NIB's concurrence, that their employment of blind persons would make up between 95 and 100 percent of the total direct labor hours required for producing 0996.

The Committee staff reviewed NIB's submission and, on May 23, 1991, requested GSA to inspect the six workshops and to review their capacity to produce 0996. On May 24, the Committee published a Notice of Proposed Rulemaking in the Federal Register proposing the addition of 0996 to the procurement list. *See* 56 Fed.Reg. 23,875–76 (1991). The Committee extended the initial closing date for comments to July 5, 1991, at McGregor's request.

In its comments, McGregor described in some detail the effect adding 0996 to the procurement list would have on the forms industry as a whole. The industry, McGregor said, relied on the production of 0996 to provide volume savings in raw materials and distribution; adding 0996 to the distribution list would, therefore, cause an increase of as much as 50 percent in the government's cost for other paper products. According to McGregor, the industry is suffering from over-capacity and thus the loss of this business would cause economic hardship. McGregor questioned the ability of the blind workshops and blind workers to produce 0996, citing the high capital costs involved in entering the forms business, the need for quick and precise work, and the dangerous production equipment. McGregor's comments were accompanied by a statement from McGregor's vice president, Victor Krakower, reiterating the condition of the forms industry and the requirements and dangers of the production process.

On July 22, 1991, the Committee's executive director, Beverly L. Milkman, sent the full text of McGregor's comments, and the comments of a trade association, plus a four-

---

4. The information necessary to calculate the percentage of the current contractors' sales affected by the Committee's decision has been redacted from the form submitted to this court as part of the Appendix.

page staff summary and analysis, to the Committee members for a vote on the addition of 0996 to the procurement list. The staff's analysis responded to McGregor's substantive comments in a terse and conclusory manner. The Committee approved the addition several days later.

Before the Committee's vote, GSA reported to the Committee staff on the results of its inspections. GSA expressed concern that none of the workshops would be prepared to supply 0996 as of the start date GSA had been given. GSA also worried about the sufficiency of the space allotted by one of the workshops for production and storage, and the price at which the workshops would be able to deliver 0996. While GSA's concern about timing had been partially alleviated by an agreement between GSA and the Committee staff in early July, which adopted phased-in startup dates and a four-month option to purchase 0996 from private suppliers to meet short-falls, GSA was still not completely satisfied as of the date of the Committee's vote.

On August 8, as a result of GSA's continuing questions, Milkman submitted to the Committee members a short memorandum noting GSA's problems with the competitiveness of the workshops' price for 0996, the space the workshops were allotting to production and storage, employee training, the ability of all of the workshops to meet the contractual start date, and overly optimistic production capacity expectations. Milkman also furnished a staff response to each of the problems GSA identified. The Committee members were given the opportunity to change their votes. None did. The Committee's decision to add 0996 to the procurement list, reported in the Federal Register on August 16, 1991, adopted the staff analysis sent to the Committee as part of the decision packet as the Committee's concise general

statement of the regulation's basis and purpose. *See* 56 Fed.Reg. 40,873 (1991); *see also HLI Lordship Indus., Inc. v. Committee for Purchase from the Blind & Other Severely Handicapped,* 791 F.2d 1136 (4th Cir. 1986).

After submitting several Freedom of Information Act requests for the documents on which the Committee relied in adding 0996 to the procurement list, McGregor petitioned the Commission for reconsideration of its decision. McGregor argued that none of the Committee's determinations—that the workshops had the capacity to produce 0996, that the certified level of blind labor could be employed, that the workshops could produce 0996 at the stated fair market price, and that there would not be a serious economic impact on the current suppliers—were supported by the record. McGregor cited the GSA reports and submitted an affidavit from Louis M. Byron, McGregor's president, in which Byron provided detailed figures concerning the capital and labor çosts and shift requirements for producing 0996, as well as information on the specific employees required for each stage of the production process. He estimated that McGregor could only employ six completely blind persons in the process.

The Committee denied McGregor's petition for reconsideration and the district court granted the Committee's motion for summary judgment, dismissing McGregor's challenge to the 0996 decision.[5]

### III

▮ Under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action" that is "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A). In informal rulemaking cases, three questions are often considered under

---

5. The district court properly rejected McGregor's argument that the Committee failed to consider sufficiently the adverse impact caused by the addition of 0996 to the procurement list. In its comments, McGregor made general claims that the addition of 0996 would cause the forms industry severe economic harm; in its petition for reconsideration, McGregor further alleged an NIB strategy to take over the forms business. McGregor did not, however, provide the Committee with sufficient information for it to be able

to evaluate those assertions. We rejected a similar claim that the Committee's analysis of adverse impact failed to consider relevant factors in *Barrier Indus.*, 584 F.2d at 1082–83. There, we concluded that Barrier had not presented to the Committee the information it needed to assess the company's claim. The Committee, we held, "was not under any obligation to solicit information directly from Barrier." *Id.* at 1083. So here.

this heading: (1) whether the rulemaking record supports whatever factual conclusions underlie the rule; (2) whether the policy determinations behind the rule are rational; and (3) whether the agency has adequately explained the basis for its conclusion.[6] The Committee comes up short on all three.

■ McGregor's comments indicated that the workshops would not be able to produce 0996 either in sufficient volume or at the declared fair market price. The Committee responded thus: "[t]he Committee has also determined that the nonprofit agencies which will produce the item have the necessary financial capability, and that the item will be furnished to the Government at a fair market price." 56 Fed.Reg. at 40,874. On what did the Committee base this factual conclusion? No one can tell on this record.

The Committee's explanation for its conclusion that the workshops would be able to produce 0996 with the certified level of blind labor is of the same order:

> The nonprofit agencies for the blind and their central nonprofit agency have a long history of adapting industrial equipment and training blind workers to ensure safe and efficient operations. The Committee took this into account in finding the agencies capable of producing this item.

*Id.* Past performance is important. It is perfectly proper for the Committee to take "this into account" in deciding future capability. But these are generalities. What of the specifics with respect to 0996? What "industrial equipment" could be adapted? Could blind workers be trained to operate that equipment safely and efficiently? Which jobs could blind workers perform? On what basis did the Committee reach a conclusion

regarding the number of blind workers that would be employed? The record again is silent.

When McGregor moved for reconsideration, it supplied an affidavit from its president giving job descriptions of the workers needed to produce 0996 and the number of blind employees he believed could be hired to fill those positions. On each eight-hour shift, McGregor employs eleven persons: two operators, two boxers, two labelers, one quality control person, one load-up man, one material handler, one "bailer room man-scrap," and one warehouseman. In the president's judgment, only the labelers could be blind. He concluded that NIB might be able to employ as many as 9 blind people, but not the 78 NIB estimated. The record contains the staff's response:

> [t]he Committee has explicit guidelines on the nature of the information to be provided by NIB and the nonprofit agencies with respect to the number of hours of direct labor to be performed by legally blind employees. Officials of both NIB and the individual nonprofit agencies are required to sign statements certifying the validity of the information submitted. This certification approach is comparable to that employed by many federal agencies, and [McGregor's attorney] was provided with copies of the various certifications in response to his FOIA request.

> In addition, as is obvious to anyone who has visited a blind nonprofit agency and observed the varied functions performed by legally blind persons, the analysis presented by McGregor's President is flawed. This is partially because he appears to be assuming that all blind workers are totally blind.[7] However, it is also because he

**6.** *See* ADMINISTRATIVE CONFERENCE OF THE UNITED STATES, A GUIDE TO FEDERAL AGENCY RULEMAKING 323 (2d ed. 1991); *see also Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962); *Consumers Union v. FTC,* 801 F.2d 417, 422 (D.C.Cir.1986); *HLI Lordship Indus., Inc. v. Committee for Purchase from the Blind & Other Severely Handicapped,*

791 F.2d at 1139–40; *Barrier Indus.,* 584 F.2d at 1079.

**7.** Under both the Act and the Committee's regulations:

> The term "blind" refers to an individual or class of individuals whose central visual acuity does not exceed 20/200 in the better eye with correcting lenses or whose visual acuity, if better than 20/200, is accompanied by a limit to the field of vision in the better eye to such a degree that its widest diameter subtends an angle of no greater than 20 degrees.

lacks knowledge of the types of accommodations made by nonprofit agencies employing blind persons to permit totally blind workers to perform a wide variety of functions, including those identified in his analysis.

This is insufficient. The questions McGregor raised are questions of fact: are blind workers capable of performing the jobs needed to produce this particular product? The questions cannot be answered merely by pointing to the general experience of NIB and the workshops. There is nothing in the record to support the Committee's apparent conclusion that blind people could do the work McGregor's president described. From all that appears, the Committee never analyzed the 0996 production process or the experience of NIB or the workshops in producing similar products. NIB has expertise in the employment of blind workers, but McGregor has expertise in forms production. It is true that "neither the Act nor the regulations require that a workshop for the blind actually produce a commodity prior to its inclusion on the procurement list," *Barrier Indus.*, 584 F.2d at 1080. But if the workshops have no experience in producing a particular commodity, the Committee cannot—in the face of serious questions raised by an experienced manufacturer—simply fall back on NIB's general experience with blind workers.

We do not believe these gaps are filled by the argument, made here and in the district court, that neither the Act nor the Committee's regulations require the workshops to use 75 percent blind labor to produce any *single* commodity. The idea is that the Act's definition of qualified nonprofit agency requires only that the agency employ "blind individuals *for not less that 75 per centum of the man-hours of direct labor required for the production or provision of the commodities or services.*" 41 U.S.C. 48b(3)(C) (emphasis supplied). Thus, under the Act, the controlling inquiry is whether the commodities can be produced by a nonprofit agency that produces its total products with at least 75% blind labor.

Brief for Federal Appellees at 24. In other words the workshops are "qualified nonprofit agencies for the blind," and, therefore, McGregor's argument that the workshops cannot hire blind workers to perform nearly 100 percent of the direct labor for 0996 is irrelevant.

Whatever may be said of the argument, there is no indication the Committee adopted it. Indeed, all indications point in the opposite direction. The Committee's staff relied on the NIB's and workshops' statements certifying that nearly 100 percent of the direct labor on 0996 would be performed by the blind. Also important are the Committee's revised regulations, rewritten after "extensive" and "comprehensive" review conducted contemporaneously with the decision here regarding 0996, *see* Notice of Proposed Rulemaking, 56 Fed.Reg. 29,760 (June 28, 1991) (Comments due by Aug. 27, 1991), and effective prior to the Committee's denial of McGregor's request for reconsideration, *see* 56 Fed.Reg. at 48,974. One provision in the revised regulations focuses on the employment opportunities created by the addition of *each* new commodity to the procurement list. *See* 41 C.F.R. § 51–2.4(a) (1993).[8] While the new language is vague enough to leave room for another interpretation, it raises serious doubts about whether the Committee based its decision to add 0996 to the procurement list on the understanding, advocated by appellate counsel, that it could add a commodity to the procurement list even though *no* blind persons would be employed in its production. We therefore cannot sustain the Committee's action on this basis. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); *see also Burlington Truck Lines*, 371 U.S. at 168–69, 83 S.Ct. at 245–46.

41 U.S.C. § 48b(1).

8. The Committee has established the following criteria, each of which must be satisfied, for determining if a commodity or service is suitable for addition to the Procurement List:

(a) *Employment potential.* The proposed addition must demonstrate a potential to generate employment for persons who are blind or have other severe disabilities.
41 C.F.R. § 51–2.4 (1993).

██ As to the Committee's determination that the workshops would be able to produce 0996 at a fair market price, the record again falls short. The statement in the Federal Register merely reports the Committee's conclusion "that the nonprofit agencies which will produce the item have the necessary industrial and financial capability, and that the item will be furnished to the Government at a fair market price." 56 Fed.Reg. at 40,874. This gives everything but the why. To be sure, the APA requires only that an agency "incorporate[ ] in the rules adopted a concise general statement of their basis and purpose," 5 U.S.C. § 553(c). But there is nothing else in the rulemaking record to explain on what basis the Committee reached its determination. The only nonconclusory statement is the Committee staff's December 19, 1991, memorandum, responding to McGregor's petition for reconsideration. It asserts:

> The Committee's pricing procedures permit the price to be modified if the cost of paper changes. Thus, the nonprofit agencies and the contracting activity are protected against changes in the cost of paper which could benefit or harm either. It should also be pointed out that NIB is responsible for initially calculating the proposed fair market price (the calculations and the bid data on which they are based are subsequently checked by Committee staff). In addition, NIB possesses cost data from the nonprofit agencies involved which indicates that the agencies can produce the item for the proposed fair market price. Moreover, each nonprofit agency involved has provided written verification to NIB that it will produce the item for the price calculated. Consequently, NIB would not have submitted materials seeking a Committee decision to add the tabulating paper if the nonprofit agencies had not indicated that they could produce it for the proposed fair market price.

If anything, this statement tends to show that the Committee may have entirely ignored the information McGregor submitted concerning the capital and labor costs incident to entering the forms production business.[9] The Committee's counsel contends, however, that all of this is a red herring. The argument is that in order to find workshops "qualified" under the Act and Committee's regulations, the Committee need only determine that the workshops will sell the commodity to the Government at the calculated fair market price. In other words, the Committee does not have to bother inquiring about whether the workshops can break even, let alone make a profit, at that price. Because the Act's purpose was to provide employment for the blind or others severely disabled, commodities and services can be taken out of competitive bidding in the private sector and added to the procurement list even when the workshops producing the commodity lose money doing so. The district court accepted this argument. We cannot because, as we have already said, there is no way of telling whether the Committee followed this sort of reasoning and this interpretation of the Act and the regulations.

Since we cannot rely upon appellate counsel's interpretation of the Act to uphold the Committee's decision, and because the reasons the Committee clearly articulated are not sufficient, the Committee's adding 0996 to the procurement list is declared unlawful and vacated.

*Reversed.*

---

9. The Committee argues that it:
   reviewed and corrected the worksheets relied on by NIB in reaching the fair market price determination. Further as the district court noted, the Committee also relied on the inspections by GSA quality engineers as well as an analysis conducted by the Committee's own staff and quality engineer on the overall capability of the workshops to produce 0996.

Brief for Federal Appellees at 28 (internal references to the record omitted). Neither the NIB worksheets nor the GSA documents provides any data concerning the costs faced by the workshops in the production of 0996 or the likely economic viability of the proposed enterprises. No analysis of this sort is in the rulemaking record.